**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | **Chapter 13** |
| | : | |
| **AMEL M. ODOM,** | : | |
| | : | **Bky. No. 15-19111 ELF** |
| Debtor. | : | |
| | : | |

# M E M O R A N D U M

## I. INTRODUCTION

Presently before the court is the Debtor Amel M. Odom's Motion for Sanctions for Violation of the Automatic Stay ("the Motion"). The respondent is the Philadelphia Parking Authority ("the PPA").

The Debtor filed the Motion on June 2, 2017, shortly after the PPA impounded his automobile. The PPA filed a response the Motion on June 16, 2017. The hearing on the Motion was held and concluded on July 20, 2017. The Debtor was the only witness. The matter is ready for decision.

What is quite striking about the Motion is that this is the second time during the pendency of this bankruptcy case that the PPA has impounded the Debtor's automobile in violation of the automatic stay. The prior seizure occurred on June 10, 2016 and is the subject of an adversary proceeding the Debtor initiated against the PPA asserting a claim under 11 U.S.C. §362(k) for violation of the automatic stay. (See Adv. No. 16-0195) ("the AP").[1] In part, the PPA's

---

[1]    11 U.S.C. §362(k) provides, in pertinent part:

> (1) . . . an individual injured by any <u>willful violation</u> of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

defenses to the current Motion mirror the defenses it raised in the AP.[2]

For the reasons set forth below, the Motion will be granted because the PPA violated the

statutory injunction imposed by 11 U.S.C. §362(a)(6).[3]   As a contempt remedy for violation of

the automatic stay, the Debtor will be awarded compensatory damages of $5,046.00 and

reasonable attorney's fees in an amount to be determined.


## II.  FINDINGS OF FACT

1.    The Debtor owns a 2007 Audi Q7 ("the Car").

2.    On December 22, 2015, the Debtor filed a voluntary Chapter 13 bankruptcy case.

3.    On January 5, 2016, the Debtor filed his bankruptcy schedules.  (Bky. No. 15-19111, Doc.
      #8).

4.    The Debtor's chapter 13 plan was confirmed on August 23, 2016.

5.    In his bankruptcy schedules, the Debtor listed a debt to the Philadelphia Traffic Court for
      unpaid parking tickets.

6.    The PPA is a local government agency whose duties include assisting the Philadelphia

---

[2]        In both matters, the PPA asserts the defense of governmental immunity.

        The events giving rise to the Motion and the Motion itself were filed while cross-motions
for summary judgment were under advisement in the AP.  Simultaneously with the entry of this
Memorandum and accompanying Order, I am entering a Memorandum (hereafter the "AP Mem.") and
Order largely denying the cross-motions.  In light of the overlap between the two (2) matters, I will refer
to the AP Memorandum later in this Memorandum.

[3]        11 U.S.C. §362(a)(6) provides that the filing of a bankruptcy petition operates as a stay
of "any act to collect, assess, or recover a claim against the debtor that arose before the commencement
of the case under this title."

Traffic Court in collecting unpaid parking tickets.[4]

### June 2016 - First Impoundment of the Car

7.  On June 10, 2016,  the PPA impounded the Car,

8.  On June 16, 2016, after receiving oral notice of the Debtor's bankruptcy filing, the PPA

    released the Car to the Debtor.

9.  Based on the June 10, 2016 impoundment of the Car, the Debtor filed an adversary

    complaint on June 16, 2016, initiating the AP asserting a claim under 11 U.S.C. §362(k).

10. In the AP, the Debtor asserts that the PPA had notice of his bankruptcy filing no later than

    April 15, 2016 (prior to the June 10, 2016 seizure of the Car).

11. In the AP, the PPA denies that it had notice of the bankruptcy filing prior to June 16, 2016.[5]

### June 2017 - Second Impoundment of the Car

12. The PPA "booted" the Car on June 1, 2017.

13. The PPA towed and impounded the Car on June 2, 2017.

14. Prior to June 1, 2017, the PPA had notice of the Debtor's bankruptcy filing.

15. The Debtor's bankruptcy case was still pending on June 1, 2017.

---

[4]      For a description of the Philadelphia Traffic Court, see AP Mem., slip op. at 3 n.2.

[5]      Thus, in the AP, while the PPA admits that it violated the automatic stay, it denies that
the violation was "willful."  Willfulness is an element of a cause of action under 11 U.S.C. §362(k).
Consequently, the PPA denies that it is subject to liability in the AP.  It also asserts governmental
immunity as a defense to the §362(k) claim.

16. The PPA's seizure of the Car was an attempt to collect a prepetition debt.[6]

17. On June 1, 2017, the Debtor was in the midst of a one (1) week vacation with his spouse and mother-in-law in Puerto Rico.

18. The Debtor's mother-in-law was terminally ill at that time.  She passed away several weeks later.

19. On June 1, 2017 the Debtor's sister telephoned and told him that the Car had been booted.

20. That night, the Debtor sent an e-mail to his bankruptcy counsel regarding the problem.

21. The next morning, June 2, 2017, the Debtor's sister telephoned the Debtor and told him that his car had been towed.

22. On June 3, 2017, the Debtor's counsel advised him that the PPA would release the Car, but that the Debtor had to retrieve the vehicle personally.

23. On June 5, 2017, the Debtor and his family returned to Philadelphia.[7]

24. Family and friends picked up the Debtor and his family and transported them from the

---

[6]    At the conclusion of the hearing, the PPA argued that the Debtor failed to provide that the booting and seizure of the Car on June 1 and 2, 2017 were motivated by an effort to collect a prepetition debt.  The PPA suggested that it was enforcing post-petition debts that have arisen.

   As factfinder, I reject this contention.  The PPA never offered any competent evidence of the existence, as of June 1, 2017, of an unpaid post-petition debt that would have caused the PPA to impound the Car.  Further, considering the nature of the contention, the PPA was in the best position to present supporting evidence.  Its failure to do so causes me to draw the opposite inference, i.e., that it is more likely than not that the PPA'sactions were based on efforts to collect a prepetition debt.  See generally Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995) (nonproduction of evidence by a party may result in negative inference that evidence would be harmful to that party if the evidence was within the party's control and there is no showing that the evidence is unavailable).

[7]    The Debtor testified that he could not remember when he left Puerto Rico or when he arrived in Philadelphia on June 5th.

airport back to their respective homes.[8]

25. The Debtor retrieved the Car from the PPA impound lot in the evening of June 5, 2017 at

approximately 9:00 to 9:30 p.m.

**Compensatory Damages**

26. The Debtor's vacation and return travel plans were disrupted by the impoundment of the

Car.[9]

27. After learning of the impoundment of the Car on June 1, 2017, the Debtor had difficulty

sleeping that night.

28. The Debtor was frustrated, confused, upset and inconvenienced by the impoundment of the

Car.

29. The seizure of the vehicle caused marital discord.[10]

30. The Debtor felt "disrespected" and was embarrassed by the impact the seizure of the Car had

on his wife and mother-in-law.[11]

---

[8]      The Debtor and his wife live together.  His mother-in-law lived elsewhere.

[9]      The Debtor had arranged for his sister to use the Car to pick up him and his family at the airport.  After the impoundment of the Car, the Debtor had to spend time making other arrangements for transportation from the airport.

[10]      The Debtor explained that he and his wife had ongoing issues as to whether the Debtor adequately handled his responsibilities.  The impoundment of the vehicle undercut the Debtor's representation to his wife that he had taken care of his prior problems with the PPA.

[11]      While the Debtor testified that he and his wife were aware that his mother-in-law was terminally ill prior to taking this vacation, he did not state whether they were aware that she would pass

(continued...)

31. The impoundment of the Car caused the Debtor to incur $46.00 in telephone charges for

   additional calls made from Puerto Rico.

32. The Debtor is entitled to $5,000.00 in damages for the emotional distress he suffered as a

   result of impoundment of the Car.

33. The Debtor suffered no other compensable damages.[12]

---

[11](...continued)
away so quickly after their return from Puerto Rico.  It is not clear how emotionally significant this joint
trip was for the family.  Thus, the record does not permit me to gauge the degree to which the news of the
impoundment negatively affected family relations and emotions.  Undoubtedly, however, the fact that
this was the second time the PPA seized the Debtor's vehicle, notwithstanding the automatic stay,
materially exacerbated the emotional distress the Debtor experienced.  In short, while I do not credit all
of the Debtor's testimony, see n.12, infra,  I credit his testimony regarding the emotional distress he
suffered as a result of this second, wrongful governmental seizure of his property.


[12]      In his testimony, the Debtor suggested that he was unable to work on June 5, 2017 and
suffered monetary work loss damages.  I am unpersuaded by this contention.  His testimony on the
subject was sketchy at best.  He claimed, somewhat implausibly, that he was scheduled to work on June
5th, the day he was returning from Puerto Rico; yet, could not remember the departure or arrival times of
his flight.  This causes me to doubt the veracity of his testimony.  If he were planning to go to his office
on the same day that he was returning from a long trip, I would expect the air travel arrangements to be
of great importance to him and that he would remember those details just six (6) weeks later at the court
hearing on the Motion.

      In addition, the Debtor testified that he works on commission and could not quantify the
effect of missing several hours of work.  In light of the fact that he retrieved the Car at around 9:00 p.m.
on June 5th, he could not explain why he could not work that day before traveling to the impoundment lot.

      In short, the Debtor was not a credible witness on the subject of work loss damages.

### III. DISCUSSION

### A.

Through the Motion, the Debtor seeks a remedy for a violation of the automatic stay. In the prayer for relief in the Motion, the Debtor invokes the civil contempt remedy.[13]

Prior to the enactment of §362(k) in 1984,[14] parties aggrieved by, and seeking a remedy for, the violation of the automatic stay ordinarily invoked the bankruptcy court's civil contempt authority under 11 U.S.C. §105(a).   See, e.g., In re Spookyworld, Inc., 346 F.3d 1, 8 (1st Cir. 2003); In re Colon, 114 B.R. 890, 895-96 (Bankr. E.D. Pa. 1990).  The statutory remedy, §362(k), supplements, but does not replace the contempt remedy.  In re Wagner, 74 B.R. 898, 902 (Bankr. E.D. Pa. 1987);[15]  accord  In re Gervin, 300 F. App'x 293, 301 (5th Cir. 2008) (nonprecedential); In re Leverette, 2013 WL 5350902, at *2 n.18 (Bankr. S.D. Miss. Sept. 25, 2013).

Civil contempt is a measure imposed to compel compliance with a court order and provide compensation to a party damaged by violation of that order. In the bankruptcy context,

---

[13]      In the Motion, the Debtor makes a passing reference to 11 U.S.C. §362(k).  In the circumstances of this case, I perceive no material difference between the two (2) remedies (i.e., contempt or §362(k)) with respect to the relief available to the Debtor.

[14]      See Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353.

[15]      In Wagner, the court observed that the precise reason for enacting §362(k) (then §362(h)), was not clear, but cited authority suggesting that §362(k) makes recovery of damages, counsel fees and costs mandatory for an aggrieved party, while such relief is only discretionary in a contempt proceeding.  74 B.R. at 902-03; see also In re Mariner Post-Acute Network, 329 B.R. 481, 488-89 (Bankr. D. Del. 2005) (citing cases).

the automatic stay is equivalent to a court order.  In re Noffsinger, 316 B.R. 283, 285 n.2 (Bankr.

W.D. Ky. 2004); Armstrong v. Bailey,  2000 WL 33363300, at *2 (D. Utah May 18, 2000); In re

Stephen W. Grosse, P.C., 84 B.R. 377, 383-84 (Bankr. E.D. Pa. 1988).  Further, knowledge of

the existence of the bankruptcy case is "treated as knowledge of the automatic stay." In re

Theokary, 444 B.R. 306, 322 (Bankr. E.D. Pa. 2011) (collecting cases)

        As a remedial measure, civil contempt sanctions are imposed whether or not the

offending party acted in good faith or without willfulness or a specific intent to violate a court

order.  Univ. Med. Ctr. v. Sullivan, 122 B.R. 919, 932 (E.D. Pa. 1990), aff'd sub nom. In re Univ.

Med. Ctr., 973 F.2d 1065 (3d Cir. 1992)

        To succeed on a claim for civil contempt, a movant must establish, by clear and

convincing evidence, that the other party violated a specific and definite court order and that the

party had knowledge of the order sufficient to put him on notice of the proscribed conduct.

Wagner, 74 B.R. at 902 (citing cases); accord In re Vector Arms, Corp., 2015 WL 8999261, at *4

(Bankr. D. Utah Dec. 11, 2015); see also  Marshak v. Treadwell, 595 F.3d 478, 485 (3d Cir.

2009) (in nonbankruptcy context, claim for civil contempt requires proof by clear and convincing

evidence that a valid order of the court existed, that the other party had knowledge of the order;

and that the other party disobeyed the order).

        Upon a finding of civil contempt, the court has broad discretion in fashioning an

appropriate remedy.  E.g., Marshak 595 F.3d at 494.  A court may impose a fine or in terrorem

damages in order to coerce compliance with its orders; it may also award damages to compensate

the aggrieved party for any actual loss suffered, as well as attorney's fees and costs.  Wagner, 74

B.R. at 902; accord In re Antonious, 373 B.R. 400, 407 (Bankr. E.D. Pa. 2007); In re Thomas,

2000 WL 341020, at *3 (Bankr. E.D. Pa. Mar. 30, 2000); see generally Robin Woods Inc. v.

Woods, 28 F.3d 396, 400 (3d Cir. 1994) (purpose of contempt remedy is make reparation to the

injured party and restore the parties to the position they would have held had the injunction been

obeyed; as civil contempt remedy, court has discretion to award compensatory damages and

attorney's fees).


**B.**

The PPA has raised two (2) arguments in the nature of affirmative defenses.  Neither

argument merits a lengthy response.

First, the PPA asserts that it is immune from monetary liability.  This is the same defense

that the PPA raised and that I rejected in the AP.  See AP Mem., slip op. at 9-13.

Second, the PPA asserts that it should not be held liable because it is not a creditor of the

Debtor; its actions were taken as an agent of the actual creditor, the Philadelphia Traffic Court.

In effect, the PPA argues that an agent of a creditor cannot be held in contempt for its own

actions in violating the automatic stay.

The PPA cites no legal authority for the proposition it espouses.  By comparison,

numerous courts have held agents of creditors liable for conduct that violated 11 U.S.C. §362(a).

See In re McMullen, 386 F.3d 320, 331 (1st Cir. 2004); In re Beckford, 2017 WL 2729495, at *6

(Bankr. D. Conn. June 23, 2017);  In re Stephen W. Grosse, P.C., 68 B.R. 847, 851 (Bankr. E.D.

Pa. 1987); see also In re Rhyne, 59 B.R. 276, 279  (Bankr. E.D. Pa. 1986) (attorney of creditor

held liable for violating discharge injunction).

The cited decisions find support in the text of 11 U.S.C. §362(a), which does not limit the

statutory injunction to the acts of creditors.  The statute states that the bankruptcy filing operates

as a stay "applicable to all entities."  The Code defines entity as including "person, estate, trust

governmental unit and the United States trustee."  11 U.S.C. §101(15).  Thus, §362(a) creates a

comprehensive injunction.  If an entity acts to collect a prepetition debt not subject to automatic

stay exceptions stated in §362(b), the entity has violated the statutory injunction.  It is irrelevant

that the entity was collecting the debt on behalf of another.

### C.

Based on my factual findings, there can be no doubt that the Debtor has established by

clear and convincing evidence all of the elements required for a finding that the PPA should be

found in contempt of the automatic stay injunction.

The automatic stay imposes a specific and definite injunction that is equivalent of a court

order.  The PPA acknowledges, as it must, that it had notice of the Debtor's bankruptcy filing

and the existence of the automatic stay.  The PPA also makes no claim that there is any

ambiguity in the terms of §362(a) with respect to its prohibition of the booting and impoundment

of the Car.  It follows that the PPA violated the injunction doing so by attempting to collect a

prepetition debt.  See 11 U.S.C. §362(a)(6) ("any act to collect . . . or recover a claim against the

debtor that arose before the commencement of the case").

### D.

The final issue involves the fashioning of an appropriate remedy for the PPA's violation

of the automatic stay.

In my discretion, I conclude that the Debtor is entitled to an award of compensatory

damages and attorney's fees.[16]

The Debtor requests two (2) types of compensatory damages.

First, he seeks reimbursement of out–of-pocket losses.  I have accepted his testimony that

he incurred $46.00 in telephone "overcharges," so I will award him $46.00 in damages.  He also

asserted that he is entitled to an award for lost employment compensation.  However, he did not

provide coherent evidence connecting the seizure of the Car to any work loss.  Nor did he

provide any basis to quantify the claimed loss.  That request will be denied.

Second, he seeks damages for emotional distress.  Recently, the Court of Appeals held

that non-pecuniary emotional harm constitutes "actual damages" within the meaning of 11

U.S.C. §362(k).  See In re Lansaw, 853 F.3d 657, 667-68 (3d Cir. 2017).  I see no reason why the

same principle should not apply in granting compensatory relief as a remedy for contempt of the

automatic stay.  Also, in Lanshaw, the court declined to establish a rigid rule requiring the

submission of medical documentation or expert medical testimony to support a damage claim for

emotional distress.  Id. at 669.  The same principle is applicable in the contempt context.

Here, given the circumstances surrounding the PPA's violation of the automatic stay, I

am satisfied that the Debtor adequately established the PPA's conduct caused him emotional

harm.  The circumstances include the facts that: this was the second post-bankruptcy

impoundment of the Car; he was in a remote location when he was informed of the seizure of the

---

[16]      In the Motion, the Debtor also requested an award of punitive damages.  It is doubtful
that I have the authority to impose punitive damages on the PPA as a contempt remedy.  See 11 U.S.C.
§106(a)(3); AP Mem., slip op. at 16-17.  Assuming arguendo that I have the authority to impose punitive
damages against the PPA, in my discretion, I decline to do so.

vehicle; that it disrupted his vacation and the return travel plans; and it caused marital discord.

As factfinder, I conclude that the Debtor is entitled to an award for emotional distress damages in the amount of $5,000.00.

Finally, in my discretion, I consider it appropriate to award the Debtor reasonable attorney's fees.  The order accompanying this Memorandum will establish deadlines for the Debtor to file an appropriate motion and for the PPA to respond.

**IV.**

For the reasons set forth above, the Motion will be granted.  An order consistent with this Memorandum will be entered.

Date:  **August 10, 2017**

**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**